IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ELITE OPERATIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| UNION PACIFIC RAILROAD CO., | § | |
| UNOVATE, INC., and UNOVATE | § | |
| ENVIRONMENTAL SERVICES, L.P., | § | |
| | § | |
| Defendants, | § | |
| | § | |
| UNION PACIFIC RAILROAD CO., | § | CIVIL ACTION NO. H-13-3461 |
| | § | |
| Third-Party Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ASBESTOS CLAIMS MANAGEMENT | § | |
| CORPORATION (f/n/a NATIONAL | § | |
| GYPSUM COMPANY); | § | |
| MARGARET DOGGETT CROW; and | § | |
| SILVER ELITE L.P., | § | |
| | § | |
| Third-Party Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Elite Operations, Inc. ("Elite"), brings this action against defendants, Union Pacific Railroad Co. ("UPRR"), Unovate, Inc., and Unovate Environmental Services, L.P. (jointly referred to as "Unovate"). Elite asserts federal causes of action against UPRR for cost recovery and contribution under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, et seq., for remedial action to

address releases or threatened releases of contamination on real property located at 2003 Edwards Street in Houston, Texas, and for declaratory judgment under 28 U.S.C. § 2201, that UPRR and not Elite is the party responsible for contaminating the Edwards Street property.[1] Elite also asserts state law causes of action against Unovate for negligence and negligent misrepresentation.[2] UPRR has asserted a counterclaim against Elite for contribution for response costs associated with alleged contamination at 2003 Edwards Street, Houston, Texas, under § 113(f) of CERCLA, 42 U.S.C. § 9613(f).[3] Pending before the court are the Memorandum and Motion in Support of Union Pacific Railroad Company's Motion for Partial Summary Judgment (Docket Entry No. 56), in which UPRR seeks summary

---

[1]First Amended Complaint, Docket Entry No. 7, pp. 5-7 ¶¶ 20-26, and 33.

[2]Id. at 6-7 ¶¶ 27-32. See Plaintiff Elite Operations, Inc.'s Response to Union Pacific Railroad Company's Motion for Partial Summary Judgment, Docket Entry No. 60, p. 5 (acknowledging that "the state law negligence claims are against a now-defunct defendant, who has never made an appearance in this litigation").

[3]Defendant Union Pacific Railroad Company's Answer and Counterclaim, Docket Entry No. 18, p. 5 ¶ 1. UPRR has also filed a Third-Party Complaint, Docket Entry No. 19, asserting contribution claims under § 113(f) of CERCLA, 42 U.S.C. § 9613(f), against Asbestos Claims Management Corporation (f/n/a National Gypsum Company), Margaret Doggett Crow, and Silver Elite, L.P. See Union Pacific Railroad Company's Third-Party Complaint, Docket Entry No. 19. Third-party defendant Silver Elite, L.P. has asserted a counterclaim against UPRR and crossclaims against other third-party defendants for contribution under § 113(f) of CERCLA, 42 U.S.C. § 9613(f), for response costs associated with the alleged contamination at 2003 Edwards Street, Houston, Texas. See Third-Party Defendant Silver Elite L.P.'s Original Answer, Counterclaim, and Crossclaims, Docket Entry No. 24.

judgment on all the claims asserted against it by Elite, and Union Pacific Railroad Company's Motion and Memorandum in Support of Its Motion to Exclude Testimony of Elite Operations, Inc.'s Expert (Docket Entry No. 64).  Also pending are Elite's objections to two exhibits attached to UPRR's motion for summary judgment (Docket Entry No. 60, pp. 16-17).  For the reasons stated below, UPRR's motion for partial summary judgment will be granted, UPRR's motion to exclude expert testimony will be denied as moot, and Elite's objections to UPRR's summary judgment evidence will be overruled as moot.

## I.  Undisputed Facts and Procedural Background

This case concerns suspected subsurface soil contamination on 1.522 acres of real property located at 2003 Edwards Street, Houston, Texas (the "Property").  From the 1880s until approximately 1962 Southern Pacific Railroad Company, a predecessor of UPRR, owned the Property, which was part of a much larger parcel used for railroad operations including a "Scrap & Reclamation Yard."[4]

In 1962 Southern Pacific sold and conveyed the Property to Trammel Crow, and a warehouse with offices was built that is still

---

[4]First Amended Complaint, Docket Entry No. 7, p. 2 ¶¶ 8-9; Memorandum and Motion in Support of Union Pacific Railroad Company's Motion for Partial Summary Judgment ("UPRR's Motion and Memorandum"), Docket Entry No. 56, p. 4 (citing Plaintiff's First Amended Complaint at ¶ 9).

there.[5]  From approximately 1963 to 1983, National Gypsum leased the Property and conducted operations there.[6]

In 1998 Elite entered into a contract to purchase the Property, and retained defendant Unovate to perform a Phase I Environmental Site Assessment ("Phase I").  The Phase I "revealed no significant evidence of environmental concerns in connection with the [Property.]"[7]  From 1998 to 2012 Elite owned the property and used the warehouse to store finished wire, rope, and cable materials for resale.[8]

In late 2012 Silver Elite offered to acquire the Property. The owner of Silver Elite, Steven J. Gibson ("Gibson"), informed Elite that one of his companies had purchased property nearby, that

_____

[5]First Amended Complaint, Docket Entry No. 7, p. 3 ¶ 11; UPRR's Motion and Memorandum, Docket Entry No. 56, p. 5 (citing Deed from Southern Pacific to Trammel Crow, Exhibit 10 to UPRR's Motion and Memorandum, Docket Entry No. 56-10).

[6]UPRR's Motion and Memorandum, Docket Entry No. 56, p. 9 (citing Stipulation and Agreed Motion to Dismiss Claims Against Third Party Defendant Asbestos Claims Management Corporation, Docket Entry Nos. 50 and 56-18, p. 2 ¶ 2 ("ACMC (f/n/a National Gypsum) stipulates that it conducted warehouse operations at 2003 Edwards during the 1960's and 1970's"); see also Agreed Order of Dismissal (Docket Entry No. 42)).

[7]First Amended Complaint, Docket Entry No. 7, p. 3 ¶¶ 12-14. See also UPRR's Motion and Memorandum, Docket Entry No. 56, p. 6 (citing Oral and Videotaped Deposition of Robert Randy Gonzalez ("Gonzalez Deposition"), Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry No. 56-1, p. 12:5-9).

[8]First Amended Complaint, Docket Entry No. 7, p. 3 ¶ 14.  See also UPRR's Motion and Memorandum, Docket Entry No. 56, p. 6 (citing Oral and Videotaped Deposition of Keith Louis Benhayon ("Benhayon Deposition"), Exhibit 2 to UPRR's Motion and Memorandum, Docket Entry No. 56-2, p. 10:12-19).

contamination from rail yard operations was discovered on that nearby property, and that similar contamination could exist beneath the 2003 Edwards Street property.[9]  Elite then commissioned and paid InControl Technologies $5,689.63 for a Limited Phase II Environmental Site Assessment ("Phase II") of the Property.[10]  "The Phase II consisted of eleven soil borings.  A total of seventeen samples were taken from these eleven soil borings.  All seventeen samples were positive for [Resource Conservation and Recovery Act ']RCRA['] Metals and other hazardous substances."[11]  Elite alleges

---

[9]First Amended Complaint, Docket Entry No. 7, pp. 3-4 ¶ 15. See also UPRR's Motion and Memorandum, Docket Entry No. 56, pp. 6-7 (citing Oral and Videotaped Deposition of Steven Jude Gibson ("Gibson Deposition"), Exhibit 3 to UPRR's Motion and Memorandum, Docket Entry No. 56-3, pp. 12-13, 23; Oral and Videotaped Deposition of Micheal Palmer ("Palmer Deposition"), Exhibit 4 to UPRR's Motion and Memorandum, Docket Entry No. 56-4, pp. 37:23-38:6, 40:7-41:13).

[10]First Amended Complaint, Docket Entry No. 7, p. 4 ¶ 15.  See also UPRR's Motion and Memorandum, Docket Entry No. 56, pp. 7-9 (citing Gonzalez Deposition, Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry No. 56-1, pp. 44:1-45:1; Benhayon Deposition, Exhibit 2 to UPRR's Motion and Memorandum, Docket Entry No. 56-2, pp. 37:5-45:25, 48:7-24; Plaintiff Elite Operations, Inc.'s Response to Union Pacific Railroad Company's Motion for Partial Summary Judgment ("Elite's Response"), Docket Entry No. 60, pp. 6-8 (citing InControl Technologies, Inc.'s December 17, 2012, Letter to Randy Gonzalez ("InControl's Report"), Exhibit 5 to UPRR's Motion and Memorandum, Docket Entry No. 56-5, and InControl Technologies, Inc.'s October 8, 2012, Letter to Randy Gonzalez ("InControl's Proposal"), Exhibit 6 to UPRR's Motion and Memorandum, Docket Entry No. 56-6; and Elite Operations, Inc.'s Responses to Union Pacific Railroad Company's Second Set of Requests for Admissions, Exhibit 20 to UPRR's Motion and Memorandum, Docket Entry No. 56-20, p. 6, Request for Admission No. 6 ("Elite Operations . . . total payments to InControl Technologies are $5,689.63.")).

[11]First Amended Complaint, Docket Entry No. 7, p. 4 ¶ 16.  See also InControl's Report, Exhibit 5 to UPRR's Motion and Memorandum, Docket Entry No. 56-5, pp. 1-4.

that "[t]he contamination consists of lead, mercury, and silver
concentrations, among other hazardous substances, that exceed the
Tier 1 Protective Concentration Levels (PCLs) for both Residential
and Commercial/Industrial property."[12]   InControl Technologies
estimated the cost to remediate the contaminated soils to achieve
a Certificate of Completion would be approximately $391,500.[13]   The
discovery of contaminants during the Phase II assessment and the
estimated cost to remediate were taken into consideration during
Elite's negotiations to sell the property to Silver Elite; the
parties referred to InControl's Report as the Soil Excavation or
Soil Removal Plan.[14]

      In 2013 Elite sold the Property to Silver Elite.[15]   Although
Elite's complaint alleges that Elite "escrowed $400,000.00 (which
was effectively the amount provided for in the investigation report
to cover _only_ the cleanup costs of the contamination on the

_____

      [12]First Amended Complaint, Docket Entry No. 7, p. 4 ¶ 17.

      [13]Elite's Response, Docket Entry No. 60, p. 7 (citing
InControl's Report, Exhibit 5 to UPRR's Motion and Memorandum,
Docket Entry No. 56-5, p. 7).   See also UPRR's Motion and
Memorandum, Docket Entry No. 56, p. 8 (citing InControl's Report,
Exhibit 5 to UPRR's Motion and Memorandum, Docket Entry No. 56-5,
p. 7).

      [14]Elite's Response, Docket Entry No. 60, p. 7 (citing
InControl's Report, Exhibit 5 to UPRR's Motion and Memorandum,
Docket Entry No. 56-5; Earnest Money Contract, Exhibit 11 to UPRR's
Motion and Memorandum, Docket Entry No. 56-11, p. 3 ¶ 5.D, p. 6
¶¶ 9-10; and Second Amendment to Earnest Money Contract,  Exhibit 12
to UPRR's Motion and Memorandum, Docket Entry No. 56-12).

      [15]First Amended Complaint, Docket Entry No. 7, p. 5 ¶ 19.

Property,"[16] Elite now admits that no funds were ever placed in escrow for this purpose.[17]   Elite explains that

> [d]uring the negotiations, Elite's initial intent was to escrow $400,000 ($391,500 — the cost of the Soil Excavation Plan — rounded up), but the existence of the escrow was changed during the negotiations. *See* Union Pacific Exhibits 1 and 3. At closing, the parties agreed that the final cost of the property was $1,800,000 and $400,000 would be credited (i.e., incurred) by Elite as payment of the Soil Excavation Plan. *See* Union Pacific Exhibits 12 and 14, at Exhibit C; Elite's Exhibit A, at p. 137; Elite's Exhibit B at pp. 97-98.
>
> The Earnest Money Contract further provides that Elite would specifically be entitled to seek recovery of the cost of the Soil Excavation Plan from any third party. *See* Union Pacific Ex. 11, at 6.[18]

On November 21, 2013, Elite filed this action against UPRR. Elite contends that "[t]he contamination discovered at the Property is consistent with rail yard operations, and the only source of the significant contamination at the Property is the former 'Scrap & Reclamation Yard' and related operations by Defendant [UPRR]."[19]

---

[16]*Id.*

[17]Elite's Response, Docket Entry No. 60, p. 7.   *See also* Gonzalez Deposition, Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry No. 56-1, p. 47:4-16 (stating that $400,000 was not escrowed and that Elite's pleadings about the escrowed funds were incorrect); Benhayon Deposition, Exhibit 2 to UPRR's Motion and Memorandum, Docket Entry No. 56-2, pp. 40:15-41:4, 58:5-16 (acknowledging that no escrow ever existed); Gibson Deposition, Exhibit 3 to UPRR's Motion and Memorandum, Docket Entry No. 56-3, p. 70:17-24 (explaining that he did not agree to an escrow because he (i.e., Silver Elite) "didn't want to have to tear down the building").

[18]Elite's Response, Docket Entry No. 60, pp. 7-8.

[19]First Amended Complaint, Docket Entry No. 7, p. 4 ¶ 17.

"UPRR denies responsibility for the contaminated soil, which it contends is fill material imported in connection with the construction of a warehouse built _after_ UPRR sold the property to Trammel Crow."[20]   UPRR and Silver Elite have asserted CERCLA contribution claims against the current and/or previous owners and operators at 2003 Edwards:  Elite, Silver Elite, Asbestos Claims Management Corporation ("National Gypsum"), and the Estate of Margaret Doggett Crow ("Trammel Crow").[21]

## II.  <u>UPRR's Motion for Partial Summary Judgment</u>

UPRR's motion for partial summary judgment seeks "dismissal of all claims asserted against it by Plaintiff, Elite Operations, Inc. ('Elite')."[22]   Asserting that "Elite has sued UPRR to recover $400,000 that Elite claims it paid into an escrow account for the sole purpose of cleaning up real property that it sold,"[23] and that

> the evidence is undisputed that: (1) there was never an escrow; (2) there was never a cleanup; (3) there is no cleanup forthcoming; and (4) there is no way that Elite could affect such a cleanup in any event, because it transferred its claims and standing to assert these claims to its buyer,[24]

---

[20]UPRR's Motion and Memorandum, Docket Entry No. 56, p. 1.

[21]Id.  <u>See also</u> Third-Party Defendant Silver Elite L.P.'s Original Answer, Counterclaim, and Crossclaims, Docket Entry No. 24.

[22]UPRR's Motion and Memorandum, Docket Entry No. 56, p. i.

[23]Id.

[24]Id. at i-ii.

UPRR argues that it is entitled to summary judgment on Elite's claims because

> A. Elite lacks standing to pursue CERCLA claims against UPRR[;]
>
> B. Elite lacks capacity to maintain this suit[;]
>
> C. Elite has no recoverable CERCLA response costs[; and]
>
> D. Elite is not entitled to declaratory relief for future CERCLA response costs.[25]

Elite responds that it has standing, has capacity, has incurred recoverable response costs, and is entitled to declaratory relief.[26] In addition, Elite objects to two exhibits attached to UPRR's Motion for Summary Judgment: (1) Exhibit 8, "Expert Report of Anthony Daus, III (GSI Environmental) regarding 2003 Edwards ('Daus Report');" and (2) "Expert Report of William F. Buckingham regarding 2003 Edwards ('Buckingham Report')."[27]

## A. Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986). The

---

[25]Id. at 1.

[26]Elite's Response, Docket Entry No. 60, pp. 8-16.

[27]Id. at 16-17.

Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S. Ct. at 2553).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by admissible evidence that facts exist over which there is a genuine issue for trial.  Id.  "[T]he nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  Id. A party opposing summary judgment must point to an evidentiary conflict in the record.  Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  Little, 37 F.3d at 1075.  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).

B.    Analysis

 In pertinent part Elite alleges:

 25.   Elite has incurred "costs of response" for removal
and/or remedial action as defined in Sections 101(23),
(24), and (25) of CERCLA, 42 U.S.C. §§ 9601(23), (24),
and (25), and as used in Section 107(a) of CERCLA, 42
U.S.C. § 9607(a) because of . . . releases and threatened
releases.   Elite now seeks to recover those "costs of
response" from UPR[R].

 26.   The response actions taken by or on behalf of Elite
at the Property were necessary to protect the public
health, welfare, or the environment, and have been and
will be consistent with the National Contingency Plan
["NCP"], 40 C.F.R. Part 300.[28]

Elite argues that

 the central issue Elite raises — whether Elite has
incurred $400,000 in response costs for a cleanup that
has not yet occurred — involves a declaratory judgment
action for the recovery of future costs and many, many
genuine issues of material fact.   As such, Union
Pacific's entire motion should be denied.

 In addition, Union Pacific's standing argument has
no merit because the Earnest Money Contract has specific
provisions showing that the parties intended for Elite to
have the cause of action to recover response costs.[29]

1.    <u>Elite Lacks Standing to Assert CERCLA Claims Against UPRR</u>

 UPRR argues that Elite lacks standing to assert CERCLA claims

against it because "Elite transferred to Silver Elite all existing

claims it had with respect to 2003 Edwards[, and that t]he law is

clear that Elite, as an assignor, does not have standing to pursue

claims it assigned."[30]   In support of this argument UPRR cites

---

[28]First Amended Complaint, Docket Entry No. 7, p. 6 ¶¶ 25-26.

[29]Elite's Response, Docket Entry No. 60, p. 6.

[30]UPRR's Motion and Memorandum, Docket Entry No. 56, p. 2.

(1) the Special Warranty Deed pursuant to which Elite conveyed to
Silver Elite the Property and "any causes of action for existing
damage to the Land and/or Improvements;"[31] (2) ¶ 9 of the Earnest
Money Contract, which provides in pertinent part "Seller [Elite]
shall have no obligation or liability whatsoever with respect to
environmental conditions . . . or the work described in the Soil
Removal Plan, all of which shall be the sole responsibility of
Buyer;"[32] and (3) the deposition testimony of Silver Elite's
principal, Steve Gibson, confirming that any future remediation was
the obligation of Silver Elite and that Silver Elite "assumed the
risk" of any remediation costs in excess of the $400,000 credit it
received at closing.[33]

UPRR cites JFE Steel Corp. v. ICI Americas, Inc., 797
F. Supp. 2d 452, 456-57 (D. Del. 2011), as a comparable case in
which a defendant challenged a claimant's standing to assert a

---

[31]Id. at 12 (citing Special Warranty Deed, Exhibit 13 to UPRR's
Motion and Memorandum, Docket Entry No. 56-13, p. 1; and Gonzalez
Deposition, Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry
No. 56-1, pp. 116:10-118:6 (acknowledging that the Special Warranty
Deed conveyed to Silver Elite causes of action regarding damage to
the land)).

[32]Id. (citing Earnest Money Contract, Exhibit 11 to UPRR's
Motion and Memorandum, Docket Entry No. 56-11, p. 6 ¶ 9; and
Gonzalez Deposition, Exhibit 1 to UPRR's Motion and Memorandum,
Docket Entry No. 56-1, p. 110:6-23 (acknowledging that these terms
in the Earnest Money Contract "ended up being the final terms of
the deal")).

[33]Id. (citing Gibson Deposition, Exhibit 3 to UPRR's Motion and
Memorandum, Docket Entry No. 56-3, pp. 66:17-67:4, 68:11-12).

CERCLA cause of action after the claimant sold all of its rights
and liabilities in connection with the contaminated property at
issue.[34] UPRR argues that

> [t]he court dealt with the clear standing problem in
> short order, granting summary judgment:
>
>> SABIC also seeks to assert, directly and
>> on its own behalf, its right to recover costs
>> under CERCLA against ICIA.   However, these
>> rights  were  assigned  by  SABIC  to  JFE.
>> Accordingly,  SABIC lacks standing to assert
>> this claim.[35]

Elite argues in response that "[UPRR's] standing argument has
no merit because the Earnest Money Contract has specific provisions
showing that the parties intended for Elite to have the cause of
action to recover response costs."[36]   Citing <u>Baton Rouge Oil &
Chemical Workers Union v. Exxonmobil Corp.</u>, 289 F.3d 373, 377 (5th
Cir. 2002), Elite argues that UPRR "ignores the fundamental axiom
of contract interpretation that specific provisions control general
provisions."[37]

### (a)   Applicable Law

Standing questions "whether the litigant is entitled to have
the court decide the merits of the dispute or of particular issues."
<u>Warth v. Seldin</u>, 95 S. Ct. 2197, 2205 (1975).   "[S]tanding is an
essential and unchanging part of the case-or-controversy requirement

---

[34]<u>Id.</u> at 12-13.

[35]<u>Id.</u> (citing <u>JFE Steel</u>, 797 F. Supp. 2d at 465).

[36]Elite's Response, Docket Entry No. 60, p. 6.

[37]Elite's Response, Docket Entry No. 60, p. 8.

-13-

of Article III." <u>Lujan v. Defenders of Wildlife</u>, 112 S. Ct. 2130,
2136 (1992). "Standing requires, at a minimum, three elements:
injury in fact, a 'fairly traceable' causal link between that injury
and the defendant's conduct, and the likelihood that the injury will
be 'redressed by a favorable decision.'" <u>Cadle Co. v. Neubauer</u>, 562
F.3d 369, 371 (5th Cir. 2009) (quoting <u>Lujan</u>, 112 S. Ct. at 2136).
"A defect in Article III standing is a defect in subject-matter
jurisdiction." <u>Id.</u> at 374. <u>See also</u> <u>Harold H. Huggins Realty, Inc.
v. FNC, Inc.</u>, 634 F.3d 787, 795 n.2 (5th Cir. 2011) ("dismissal for
lack of constitutional standing . . . should be granted under
Rule 12(b)(1)"). "Standing is a question of law" for the court to
decide. <u>Friends of St. Francis Xavier Cabrini Church v. Federal
Emergency Management Agency</u>, 658 F.3d 460, 466 (5th Cir. 2011).
Subject to limited exceptions, Texas law allows assignees to assert
assigned claims. <u>See</u> <u>State Farm Fire & Casualty Co. v. Gandy</u>, 925
S.W.2d 696, 705-07 (Tex. 1996) (acknowledging that causes of action
in Texas are freely assignable). <u>See</u> <u>Southwestern Bell Telephone
Co. v. Marketing on Hold Inc.</u>, 308 S.W.3d 909, 916 (Tex. 2010) (a
holder of contractually valid assignments steps "into the shoes of
the claim-holders and is considered under the law to have suffered
the same injury as the assignors and have the same ability to pursue
the claims").

(b)    Application of the Law to Undisputed Facts

The Special Warranty Deed pursuant to which Elite conveyed the
Property to Silver Elite conveyed to Silver Elite "any causes of

-14-

action for existing damage to the Land and/or Improvements."[38]   The

Earnest Money Contract between Elite and Silver Elite states that

Elite retained the right "to recover the cost of the Soil Removal

Plan from any responsible third party."[39]   The Earnest Money

Contract also described indemnities and joint representation for

litigation that was anticipated to be filed after closing.[40]   But

neither of these two provisions from the Earnest Money Contract

appear in the Special Warranty Deed.   Under Texas law

> [w]hen a deed is delivered and accepted as performance of
> a contract to convey, the contract is merged in the deed.
> Though the terms of the deed may vary from those
> contained in the contract, still the deed must be looked
> to alone to determine the rights of the parties.

Alvarado v. Bolton, 749 S.W.2d 47, 48 (Tex. 1988) (quoting Baker v.

Baker, 207 S.W.2d 244, 249 (Tex. Civ. App. — San Antonio 1947, writ

ref'd n.r.e.)).   This principle of law is commonly referred to as

the doctrine of merger.   Id.   Although the merger doctrine is not

without exception, the parties to this action have not argued that

an exception applies in this case.

Elite's reliance on Baton Rouge Oil, 289 F.3d at 377, for that

court's   assertion   that   a   "fundamental   axiom   of   contract

---

[38]Special Warranty Deed, Exhibit 13 to UPRR's Motion and
Memorandum, Docket Entry No. 56-13, p. 1.   See also Gonzalez
Deposition, Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry
No. 56-1, pp. 116:10-118:6 (acknowledging that the Special Warranty
Deed conveyed to Silver Elite causes of action regarding damage to
the land).

[39]Earnest Money Contract, Exhibit 11 to UPRR's Motion and
Memorandum, Docket Entry No. 56-11, p. 6 ¶ 10.

[40]Id.

interpretation [is] that specific provisions control general provisions,"[41] has no merit because at issue in that case were conflicting provisions of a single contract, i.e., a collective bargaining agreement, while at issue here are conflicting provisions of two separate agreements: an earnest money contract and a subsequently delivered and accepted deed. Because the Special Warranty Deed pursuant to which Elite conveyed the Property to Silver Elite states that Elite conveyed "any causes of action for existing damage to the Land and/or Improvements,"[42] and did not reserve to Elite the right to recover the cost of the Soil Removal Plan from any responsible third party, the court concludes that Elite lacks standing to bring the CERCLA claims asserted in this action. See Pringle v. Atlas Van Lines, 14 F. Supp. 3d 796, 800 (N.D. Tex. 2014) ("Once the assignor assigns its rights to pursue a claim against a third party to another, the assignor retains no right to sue the third party. An assignment transfers all rights to the thing assigned.").

    2.  Elite Has Not Incurred Recoverable Response Costs

    Even if Elite did have standing to assert CERCLA claims for response costs, UPRR argues that it is entitled to summary judgment

_____

[41]Elite's Response, Docket Entry No. 60, p. 8.

[42]Special Warranty Deed, Exhibit 13 to UPRR's Motion and Memorandum, Docket Entry No. 56-13, p. 1. See also Gonzalez Deposition, Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry No. 56-1, pp. 116:10-118:6 (acknowledging that the Special Warranty Deed conveyed to Silver Elite causes of action regarding damage to the land).

because Elite did not act to remove contamination or remedy the direct effect of contamination and, therefore, did not incur any costs that are recoverable as response costs under CERCLA.[43] UPRR argues that

> Elite attempts to dress up its diminution of market value damages as CERCLA response costs with fictional allegations about funding a $400,000 escrow account that never even existed. But no matter what costs Elite may have incurred, none of them are recoverable under CERCLA because they were neither necessary nor consistent with the National Contingency Plan ("NCP"). According to the sworn testimony of Elite's and Silver Elite's corporate representatives, any costs that Elite incurred were not incurred in response to an imminent threat to human health and the environment. Rather, Elite's costs, including the costs of obtaining the InControl Report, were incurred in order to "establish the price" for 2003 Edwards and determine the price reduction necessary to close the 2003 Edwards Transaction. Furthermore, even if Elite's costs were somehow "necessary," as defined by CERCLA, Elite utterly failed to comply with the public participation requirements of the NCP. In order for response costs to be recoverable, they must be NCP-compl[ia]nt. If not, summary judgment is appropriate.[44]

Elite responds that it

> clearly, as a matter of law, has incurred response costs under CERCLA and thus has a valid CERCLA claim against Union Pacific. Nevertheless, the central issue Elite raises — whether Elite has incurred $400,000 in response costs for a cleanup that has not yet occurred — involves a declaratory judgment action for the recovery of future costs and many, many genuine issues of material fact.[45]

(a) Applicable Law

Congress enacted CERCLA "to encourage private parties to assume the financial responsibility of cleanup by allowing them to

---

[43]UPRR's Motion and Memorandum, Docket Entry No. 56, p. 3.

[44]Id.

[45]Elite's Response, Docket Entry No. 60, p. 6.

seek recovery from others." Key Tronic Corp. v. United States, 114
S. Ct. 1960, 1967 & n.13 (1994). See also Burlington Northern &
Santa Fe Railway Co. v. Poole Chemical Co., 419 F.3d 355, 364 (5th
Cir. 2005) (quoting OHM Remediation Services v. Evans Cooperage
Co., 116 F.3d 1574, 1578 (5th Cir. 1997) ("In enacting CERCLA,
Congress intended 'to facilitate the prompt cleanup of hazardous
waste sites and to shift the cost of environmental response from
the taxpayers to the parties who benefitted from the wastes that
caused the harm.'")). CERCLA § 107(a), 42 U.S.C. § 9607(a)(1)-(4),
provides potentially responsible parties ("PRPs") with a cause of
action to recover costs from other PRPs. United States v. Atlantic
Research Corp., 127 S. Ct. 2331, 2334 (2007).

> To establish a prima facie case of liability in a CERCLA
> cost recovery action, a plaintiff must prove: (1) that
> the site in question is a "facility" as defined in
> § 9601(9); (2) that the defendant is a responsible person
> under § 9607(a); (3) that a release or threatened release
> of a hazardous substance has occurred; and (4) that the
> release or threatened release has caused the plaintiff to
> incur response costs.

Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 668 (5th Cir. 1989).
See also Licciardi v. Murphy Oil U.S.A., Inc., 111 F.3d 396, 398
(5th Cir. 1997) (per curiam) (citing Amoco Oil, 889 F.2d at 668,
for its statement of the elements of a CERCLA cost recovery claim).
"A plaintiff may recover those response costs that are necessary
and consistent with the National Contingency Plan ('NCP')." Amoco
Oil, 889 F.2d at 668 (citing § 9607(a)(4)(B); 40 C.F.R. Part 300).

(b)  Application of the Law to Undisputed Facts

The parties do not dispute that the Property is a "facility" as defined by 42 U.S.C. § 9601(9),[46] that UPRR is a PRP, or that there was a "release" of a hazardous substance at that Property under 42 U.S.C. § 9607(a)(4).[47]  At issue is whether Elite has incurred response costs that were necessary and consistent with the NCP.

#### (1)  Response Costs Sought Were Not "Necessary"

Citing <u>G.J. Leasing Co., Inc. v. Union Electric Co.</u>, 54 F.3d 379, 386 (7th Cir. 1995), UPRR argues that Elite has failed to present any evidence capable of establishing that the costs it claims to have incurred are "necessary" under CERCLA.[48]  In <u>G.J. Leasing</u> the district court granted summary judgment to the defendant upon finding that costs of removing asbestos that the plaintiff sought to recover were not "necessary."  The court explained that

---

[46]CERCLA defines "facility" as "(A) any building, structure, installation, equipment, pipe or pipeline . . ., well, pit pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . ." § 9601(21).

[47]CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . ." § 9601(22).  The Fifth Circuit construes "release" broadly.

[48]UPRR's Motion and Memorandum, Docket Entry No. 56, p. 18.

> [a] theoretical threat is not enough. For response costs to be "necessary," plaintiffs must establish that an actual and real public health threat exists *prior to initiating a response action*. To show that costs incurred were "necessary" under CERCLA, a party must show (1) that the costs were incurred *in response* to a threat to human health or the environment, and (2) that the costs were necessary to address the threat. Also, CERCLA liability attaches only where a release or threatened release of a hazardous substance "causes the incurrence of response costs." In this case, the evidence established that plaintiffs had other business reasons for undertaking site investigations and abatement actions. To the extent that these actions were taken for purposes other than responding to an actual and real public health threat, there is no CERCLA liability.

G.J. Leasing Co. v. Union Electric Co., 854 F. Supp. 539, 562 (S.D. Ill. 1994), aff'd, 54 F.3d 379 (7th Cir. 1995) (internal citations omitted). Affirming the district court's grant of summary judgment, the Seventh Circuit explained that "[t]he statutory limitation to 'necessary' costs of cleaning up is important. Without it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else." G.J. Leasing, 54 F.3d at 386.

UPRR argues that the $400,000 in costs that Elite seeks to recover as response costs were not "necessary" for CERLCA purposes because they were not incurred to contain a release that threatened the public health or the environment. In support of this argument, UPRR cites Elite's written discovery responses stating that no remediation costs have been incurred, and predicting that $400,000 in remediation work "will be undertaken" at some future time, albeit, not by Elite:

-20-

INTERROGATORY NO. 4

Describe all Remediation Work that You may or intend to undertake at 2003 Edwards and identify all Communications, filings or actions made or undertaken with any regulatory agency or other Person Concerning such Remediation.

ANSWER:

The future remedial activities will be undertaken by an environmental consultant paid by the funds transmitted to the buyer of 2003 Edwards. To the best of Elite Operations' knowledge, no active environmental remediation work has occurred at 2003 Edwards since July 26, 2013. But, as per the agreement of the parties regarding the contract to sell 2003 Edwards, the future environmental remediation work will occur and is estimated to cost approximately $400,000.[49]

Elite responds that it has incurred two types of recoverable response costs: "(1) costs for investigation and (2) costs for the Soil Excavation Plan. The investigation response costs consist of the payments made to InControl Technologies for the environmental investigation. The costs for the Soil Excavation were those costs incurred at closing."[50] Elite argues that a number of cases have held that investigative costs are recoverable response costs in a CERCLA action. Elite argues that the costs for the Soil Excavation Plan are recoverable response costs because

the Earnest Money Contract and its Amendments make clear that:

---

[49]Third-Party Defendant Elite Operations, Inc.'s Objections and/or Responses to Defendant/Third-Party Plaintiff Union Pacific Railroad Company's First Set of Requests for Admissions, First Set of Interrogatories and First Set of Requests for Production, Exhibit 17 to UPRR's Motion and Memorandum, Docket Entry No. 56-17, p. 15, Interrogatory No. 4.

[50]Elite's Response, Docket Entry No. 60, p. 11.

> Pursuant to a plan developed by Incontrol
> Technologies, the parties stipulate and agree
> that the cost of soil excavation and
> remediation will be at least $400,000; and,
> therefore, the $400,000 Deposit will be
> delivered to Buyer at Closing.[51]

Section 107(a)(2)(B), which expressly creates a private cause of action to recover response costs, states, in pertinent part, that PRPs "shall be liable for . . . (B) any other *necessary costs of response* incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(2)(B) (emphasis added). Thus, whether the costs of response at issue were "necessary" is a threshold issue for recovery under § 107(a). CERCLA, however, does not define the phrase "necessary costs of response." See 42 U.S.C. § 9607(a)(4)(B). The Fifth Circuit has held that "[t]o justifiably incur response costs, one necessarily must have acted to contain a release threatening the public health or the environment." In re Taira Lynn Marine Ltd. No. 5, LLC, 444 F.3d 371, 381-82 (5th Cir. 2006) (quoting Amoco Oil, 889 F.2d at 669-70).

The evidence before the court establishes that Elite paid InControl Technologies $5,689.63 for the Phase II environmental investigation of the Property,[52] and that at closing Silver Elite

---

[51]Id. at 13 (quoting Second Amendment to Earnest Money Contract, Exhibit 12 to UPRR's Motion and Memorandum, Docket Entry No. 56-12, p. 2 ¶ 3).

[52]Elite Operations, Inc.'s Responses to Union Pacific Railroad Company's Second Set of Requests for Admissions, Exhibit 20 to UPRR's Motion and Memorandum, Docket Entry No. 56-20, p. 6, Request
(continued...)

received a "Soil Excavation Credit" of $400,000 towards the $1,800,000 purchase price.[53] But because Elite has failed to present any evidence showing that either of these costs was incurred to contain a release that threatened the public health or the environment, Elite has failed to raise a genuine issue of material fact for trial as to whether these costs were "necessary" under CERCLA. Undisputed evidence shows that the only reason that Elite undertook the Phase II environmental investigation was because Silver Elite advised Elite that a neighboring property was found to have contaminated soil, and that there existed a possibility that the contaminated soil extended onto the Property. Elite has not shown and the InControl Report does not state that the Property as it existed when Silver Elite offered to purchase it posed a threat to public health or the environment. Nor does the InControl Report state that the Property needed remediation to protect the public health or the environment. Although Elite alleges that "[t]he contamination consists of lead, mercury, and silver concentrations, among other hazardous substances, that exceed the Tier 1 Protective Concentration Levels (PCLs) for both Residential and Commercial/Industrial property"[54] and cites statements in the InControl Report that levels of certain

---

[52](...continued)
for Admission No. 6 ("Elite Operations . . . total payments to InControl Technologies are $5,689.63.").

[53]Seller's Statement, Exhibit 14 to UPRR's Motion and Memorandum, Docket Entry No. 56-14.

[54]First Amended Complaint, Docket Entry No. 7, p. 4 ¶ 17.

-23-

substances exceed Tier 1 PCLS for residential property, Elite fails to cite any evidence showing that levels of any substances exceed Tier 1 PCLs for commercial or industrial use.  Undisputed evidence shows that no cleanup of the Property took place while Elite owned it, and that although at closing Silver Elite received a "Soil Excavation Credit" of $400,000, no soil excavation has taken place, and if any soil excavation ever does take place in the future, it will not be undertaken by Elite but by Silver Elite.  The evidence before the court establishes therefore neither the costs for investigation nor the costs for the Soil Excavation Plan credited to Silver Elite at closing were necessary to contain a threat to the public health or the environment caused by a release on the Property.

Additional evidence that the response costs that Elite seeks to recover in this action were not necessary comes from the deposition testimony of Elite's president, Gonzalez, Elite's vice-president, Benhayon, and Silver Elite's principal, Gibson, all of whom testified that no cleanup of the Property was ever contemplated, that Silver Elite had no obligation to clean up the Property, and that the purpose for having the InControl Technologies Report prepared was to establish a price for the property.  For example, Silver Elite's Gibson testified that despite having received a Soil Excavation Credit at closing, Silver Elite had no obligation to clean up the Property, that there has been no cleanup at the Property, and that the reason the $400,000

-24-

was treated as a credit at closing instead of placed in escrow was
because Silver Elite did not want to have to tear down the
warehouse:

> Q.   Mr. Gibson, do you believe that you or Silver Elite
>       has a legal obligation to remediate 2003 Edwards,
>       as it sits there today?
>
> A.   No.
>
> Q.   Could you sell it to somebody else in its current
>       condition?
>
> A.   Yes.[55]
>
> . . .
>
> Q.   Okay.  What was your reaction to the concept of
>       putting the $400,000 into an escrow account to fund
>       the remediation, rather than simply a credit at the
>       -- off the purchase price?
>
> A.   I said, "No."
>
> Q.   Andy why did you say, "No"?
>
> A.   Because I didn't want to have to tear down the
>       building.[56]
>
> . . .
>
> Q.   Okay.  To this point in time, Silver Elite has not
>       incurred any remediation costs or anything like
>       that associated with 2003 Edwards; is that right?
>
> A.   Maybe copying costs and, obviously, time.
>
> Q.   But remediation costs for 2003 --
>
> A.   No.
>
> Q.   -- Edwards?

---

[55]Gibson Deposition, Exhibit 3 to UPRR's Motion and Memorandum,
Docket Entry No. 56-3, p. 42:2-8.

[56]Id. at 70:17-24.

-25-

A.     No.

Q.     Okay.  And just to clarify, to the extent that
       there's an allegation made by Elite Operations that
       there is a $400,000 escrow, that the money was
       placed into escrow for purposes of cleanup, that
       would be incorrect; is that right?

A.     That's incorrect.[57]

Elite argues that at the very least preparation of the InControl Report was a timely investigation into the need for remediation.  But the purpose behind the InControl Report, and hence Elite's investigation, centered on the need to establish a price for the sale of the Property by Elite to Silver Elite, not on the need for a CERCLA-quality response to contain a threat to the public health or environment posed by a release on the Property. Because Elite has failed to cite any evidence capable of establishing that any of the costs it seeks to recover were necessary to contain a threat to the public health or the environment caused by a release on the Property, Elite has failed to raise a genuine issue of material fact for trial that any of the costs it incurred are necessary response costs recoverable in a CERCLA § 107 action.  See Regional Airport Authority of Louisville v. LFG, LLC, 460 F.3d 697, 706 (6th Cir. 2006) ("To recover CERCLA

---

[57]Id. at 94:12-25.  See also Benhayon Deposition, Exhibit 2 to UPRR's Motion and Memorandum, Docket Entry No. 56-2, pp. 42:1-25, 48:14-18 (testifying that the InControl Report was used as the basis for establishing the price for the sale of the Property to Silver Elite); Gonzalez Deposition, Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry No. 56-1, p. 61:2-12 (testifying that the InControl Report and Soil Excavation Plan were not about remediating contamination that threatened the public health or the environment, but about redeveloping the Property with townhouses).

damages . . . the parties must show that the threat to public health or the environment was the predicate for action. Otherwise, businesses that happened to operate on contaminated property, yet took no additional measures to do so, would realize unearned fixed-cost advantages over their competitors. We do not believe that Congress, in enacting CERCLA, intended such a result.").

                  **(2)   Response Costs Not "Consistent" with the NCP**

       CERCLA requires "necessary costs of response" to be consistent with the "NCP."   42 U.S.C. § 9607(a)(4).   The NCP, 40 C.F.R. Part 300, promulgated by the Environmental Protection Agency ("EPA") as a regulation pursuant to CERCLA § 105, 42 U.S.C. § 9605, provides "an organizational structure and procedures for preparing for and responding to the discharge of hazardous substances, pollutants and contaminants."   40 C.F.R. § 300.1.   The NCP articulates "methods for investigating the environmental and health problems resulting from a release or threatened release and criteria for determining the appropriate extent of response activities." United States v. Chromalloy American Corp., 158 F.3d 345, 349 (5th Cir. 1998) (quoting Matter of Bell Petroleum Services, Inc., 3 F.3d 889, 894 (5th Cir. 1993)).

       UPRR argues that Elite did not act consistently with the NCP because it ignored the public participation requirement.[58]   A

---

     [58]UPRR's Motion and Memorandum, Docket Entry No. 56, p. 19.

contamination cleanup is consistent with the NCP if, taken as a whole, it is in "substantial compliance" with 40 C.F.R. § 300.700(c)(5)-(6), and results in a CERCLA-quality cleanup. 40 C.F.R. § 300.700(c)(3)(i). An immaterial or insubstantial deviation, however, will not result in a cleanup that is "not consistent" with the NCP. 40 C.F.R. § 300.700(c)(4). The relevant provision of the NCP for purposes of this case concerns community relations and the opportunity for public comment on the planned remediation. See 40 C.F.R. § 300.700(c)(6) (stating that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action"). Where relevant, these "community relations" provisions require, inter alia, that a party solicit concerns from the public and prepare a formal community relations plan, § 300.430(c)(2)(i)-(ii), and that the party make available for public comment a report describing the preferred remedy along with alternatives, § 300.430(f)(2)-(3).

The evidence before the court establishes that Elite did not solicit concerns from the public, prepare a formal community relations plan, or make available for public comment a report describing the preferred remedy along with alternatives. Elite argues that satisfaction of these NCP requirements is premature and that they will be satisfied in the future. The problem with this argument is that the responsibility for cleaning up the Property now lies with Silver Elite, and Silver Elite has no obligation to

clean up the Property.[59]   Accordingly, the court concludes that
Elite has failed to cite any evidence capable of raising a genuine
issue of material fact that it has acted consistent with the NCP as
required to recover CERCLA response costs.

   3.   Elite Lacks Standing to Assert Declaratory Judgment Claim
        Against UPRR

   UPRR argues that "Elite is not entitled to declaratory
judgment for future costs."[60]  Asserting that "[i]n order for a
declaratory judgment to be appropriate, a CERCLA claimant must
first establish all essential elements of a CERCLA claim —
including the incurrence of recoverable response costs,"[61] UPRR
argues that

> Elite bears no responsibility whatsoever to incur future
> costs of response with respect to 2003 Edwards.  Both
> Elite and Silver Elite admit that all of that
> responsibility resides with Silver Elite, which is
> currently renting 2003 Edwards as a warehouse, has done
> no remediation whatsoever, and may never do any
> remediation.  Instead, Silver Elite testified that it
> could lease or even sell 2003 Edwards today without doing
> any remediation whatsoever.  Because Elite cannot recover
> past costs as a matter of law, and will never incur them
> in the future, declaratory relief for future costs is
> both inequitable and unavailable as a matter of law.[62]

Because undisputed facts establish that the Special Warranty Deed
pursuant to which Elite conveyed to Silver Elite the Property also
conveyed to Silver Elite "any causes of action for existing damage

---

[59]Id. at 42: 2-8.  See also Benhayon Deposition, Exhibit 2 to
UPRR's Motion and Memorandum, Docket Entry No. 56-2, p. 42:1-25.

[60]UPRR's Motion and Memorandum, Docket Entry No. 56, p. 3.

[61]Id.

[62]Id. at 3-4.

to the Land and/or Improvements,"[63] the court concludes that Elite lacks standing to assert a declaratory judgment claim for future costs for the same reasons that Elite lacks standing to assert a CERCLA claim for response costs that Elite contends it has already incurred.  See § II.B.1, above.  Accordingly, the court concludes that UPRR is entitled to summary judgment on Elite's declaratory judgment claim for future response costs.

### III.  Conclusions and Order

For the reasons stated above, Union Pacific Railroad Company's Motion for Partial Summary Judgment (Docket Entry No. 56) is **GRANTED**.  Because the court has resolved UPRR's motion for partial summary judgment without referring to any of the summary judgment to which either party has objected or sought to exclude, Elite's objections to UPRR's summary judgment evidence asserted in Docket Entry No. 60 at pages 16-17 are **OVERRULED**, and Union Pacific Railroad Company's Motion and Memorandum in Support of Its Motion to Exclude Testimony of Elite Operations, Inc.'s Expert (Docket Entry No. 64) is **DENIED** as **MOOT**.

SIGNED at Houston, Texas, this 17th day of September, 2015.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[63]Id. at 12 (citing Special Warranty Deed, Exhibit 13 to UPRR's Motion and Memorandum, Docket Entry No. 56-13, p. 1; and Gonzalez Deposition, Exhibit 1 to UPRR's Motion and Memorandum, Docket Entry No. 56-1, pp. 116:10-118:6 (acknowledging that the Special Warranty Deed conveyed to Silver Elite causes of action regarding damage to the land)).